DAVID ADLER & SONS CLOTHING COMPANY, APPELLEE, AND FIRST NATIONAL BANK OF OMAHA ET AL., APPELLANTS, V. MARIA HELLMAN, APPELLANT, ET AL.

FILED JUNE 9, 1898. No. 7762.

1. **Witnesses: TRANSACTIONS WITH PERSONS DECEASED: FRAUDULENT CONVEYANCES.** In an action, by creditors of an estate in which there is a deficiency of assets to meet debts, to set aside alleged fraudulent conveyances of property, during lifetime by the deceased, to the party executrix of the estate, and to subject such property to the payment of debts of the deceased, the executrix is incompetent, under the provisions of section 329 of the Code of Civil Procedure, to testify of the transaction or agreement from which the conveyance originated.

2. ———: ———: **ATTORNEYS: CONFIDENTIAL COMMUNICATIONS.** The testimony of an attorney, who was present as adviser of one or both parties, of the conversation between them or disclosures then made may not be suppressed on the ground that the disclosures were confidential communications, or privileged, in an action between the parties or their personal representatives.

3. **Dower: EXTINGUISHMENT.** The dower right of a wife in the real estate of her husband while inchoate is not a possessory right, but is a present, subsisting right or interest of a legal character, and can only be extinguished by the voluntary release or act of the wife or operation of law. (*Butler v. Fitzgerald*, 43 Neb. 192; *Wylie v. Charlton*, 43 Neb. 840.)

4. ———: **RELEASE: MORTGAGE.** The wife may make her release of her dower interest, or by signature to a mortgage that it be subjected to the lien and operation thereof, matter of forceful consideration for the conveyance to her of other property.

5. **Fraudulent Conveyances: INTENT.** In an attack on a conveyance by creditors as fraudulent, in this state, the question of the intent with which the conveyance was made is one of fact and not of law. (Compiled Statutes, ch. 32, sec. 20.)

6. ———: **HUSBAND AND WIFE: BURDEN OF PROOF.** If a conveyance of property by a husband to his wife is sought to be avoided by

Adler & Sons Clothing Co. v. Hellman.

creditors for its fraudulent character, the burden of proof is on the wife to establish the *bona fides* of the transfer.

7. **Insolvency: DEFINITION.** As a general rule, insolvency means that the party whose business affairs are in question is unable to pay his debts as they become due in the ordinary course of his daily transactions. (*Buchanan v. Smith*, 16 Wall. [U. S.] 308.)

8. ——: ——. Insolvency may mean the inadequacy of a man's funds or property to pay his debts.

9. **Husband and Wife: GIFTS.** A man may make a gift to his wife or relatives, if he retain sufficient property subject to execution at the then fair valuation to satisfy all his debts; and that he has made such gift under such circumstances does not of itself as evidence stamp or establish the transfer fraudulent as to creditors.

10. ——: GOOD FAITH OF TRANSFER. *Held,* That the evidence in the present case sustained a finding of the *bona fides* of certain transfers of property from a husband to his wife.

11. **Life-Insurance Premiums: RECOVERY BY CREDITORS.** As a general rule, premiums paid for life insurance in favor of a wife and children, or either, cannot be recovered by creditors as made in fraud of their rights, though the debts were existent at the times of such payment.

12. **Husband and Wife: TITLE TO REALTY: ESTOPPEL.** If a wife allow her husband to retain the title of property to which she is entitled in her own right, and use it to obtain credit, as against the enforcement of a debt which a creditor was influenced by the husband's apparent, and in the transaction asserted, ownership of the property to allow him to contract, she may be estopped to claim the property.

APPEAL from the district court of Douglas county. Heard below before DUFFIE, J.   *Affirmed.*

The opinion contains a statement of the case.

*Warren Switzler*, for the First National Bank of Omaha, appellant, and others:

There was no legal evidence offered to support the alleged contract between Mr. and Mrs. Hellman. Mrs. Hellman and Mr. Connell were both incompetent witnesses. As against the representatives of a deceased person Mrs. Hellman cannot disclose the communications made to her by her husband. An attorney should not be per-

mitted to disclose confidential communications properly intrusted to him in his professional capacity. (*Wertz v. Merritt*, 39 N. W. Rep. [Ia.] 103; *Johnston v. Johnston*, 27 N. E. Rep. [Ill.] 930; *Muir v. Miller*, 47 N. W. Rep. [Ia.] 1011; *Bradford v. Vinton*, 26 N. W. Rep. [Mich.] 401; *Brock v. Brock*, 9 Atl. Rep. [Pa.] 486; *Skinner v. Skinner*, 38 Neb. 756; *Wylie v. Charlton*, 43 Neb. 840; *Westover v. Ætna Life Ins. Co.*, 99 N. Y. 56; *Hull v. Lyon*, 27 Mo. 570; *Whiting v. Barney*, 30 N. Y. 330; *Root v. Wright*, 84 N. Y. 72; *Yates v. Olmsted*, 56 N. Y. 632; *Robson v. Kemp*, 4 Esp. [Eng.] 233; *Britton v. Lorenz*, 45 N. Y. 57; *Edington v. Ætna Life Ins. Co.*, 77 N. Y. 564; *Pierson v. People*, 79 N. Y. 424; *Glenn v. Liggett*, 47 Fed. Rep. 472; *Liggett v. Glenn*, 2 C. C. A. [U. S.] 286; *State v. Dawson*, 90 Mo. 149.)

The alleged contract between Mr. and Mrs. Hellman, if proved, cannot be enforced. It was obtained under a misapprehension of the law and facts which amounted to false pretenses. The dower interest was not a sufficient consideration. If the contract was proved by competent evidence and sustained consideration, still Mrs. Hellman is estopped to urge it. (*Trumble v. Trumble*, 37 Neb. 340; *Smith v. Sieberling*, 35 Fed. Rep. 677; *Roy v. McPherson*, 11 Neb. 197; *Steele v. Coon*, 27 Neb. 586; *Sexton v. Wheaton*, 8 Wheat. [U. S.] 229; *Worseley v. De Mattos*, 1 Burr. [Eng.] 467; *Leukener v. Freeman*, Freem. Ch. [Eng.] 236; *Goldsmith v. Fuller*, 30 Neb. 569; *Early v. Wilson*, 31 Neb. 459; *Swartz v. McClelland*, 31 Neb. 646; *Hews v. Kenney*, 43 Neb. 815.)

The assignment of the insurance was a fraud on creditors. (*Ionia County Savings Bank v. McLean*, 48 N. W. Rep. [Mich.] 159; *Elliott Appeals*, 50 Pa. St. 75; *Freeman v. Pope*, 9 L. R. Eq. 206; *Anderson v. Hay*, 85 Pa. St. 202; *Stokes v. Coffey*, 8 Bush [Ky.] 533; *Payne v. Pusey*, 8 Bush [Ky.] 567; *Hathaway v. Sherman*, 61 Me. 475; *Anthracite Ins. Co. v. Sears*, 109 Mass. 383; *Barry v. Equitable Life Assurance Co.*, 59 N. Y. 593; *Pence v. Makepeace*, 65 Ind. 360; *Stigler v. Stigler*, 77 Va. 163; *Talcott v. Field*, 34 Neb. 611; *Fearn v. Ward*, 80 Ala. 555.)

A creditor of the husband may recover premiums paid by an insolvent on insurance. (*Central Bank of Washington v. Hume*, 128 U. S. 195; *Merchants & Miners Transportation Co. v. Borland*, 31 Atl. Rep. [N. J.] 278; *Central Nat. Bank v. Hume*, 9 Sup. Ct. Rep. 41.)

The creditors are the proper parties to bring suit, and in so doing they become the representatives of the deceased person. (*Harvey v. McDonell*, 21 N. E. Rep. [N. Y.] 695; *Grier v. Cagle*, 87 N. Car. 377; *Martin v. Smith*, 25 W. Va. 579; *New York Mutual Life Ins. Co. v. Armstrong*, 117 U. S. 597; *Reddick v. Keesling*, 129 Ind. 128; *Davis v. Davis*, 26 Cal. 37; *Hollister v. Young*, 41 Vt. 160; *Wamsley v. Crook*, 3 Neb. 344; *Ransom v. Schmela*, 13 Neb. 78; *Clark v. Clough*, 23 Atl. Rep. [N. H.] 526; *New York Life Ins. Co. v. Flack*, 3 Md. 352; *Housel v. Cremer*, 13 Neb. 300.)

Decisions on insolvency applicable to the case: *Hinde v. Longworth*, 11 Wheat. [U. S.] 199; *Miller v. Thompson*, 3 Port. [Ala.] 196; *Schaible v. Ardner*, 56 N. W. Rep. [Mich.] 1105; *Winchester v. Charter*, 97 Mass. 140; *Potter v. McDowell*, 31 Mo. 62; *Farrow v. Hayes*, 51 Md. 498; *Allen v. McTavish*, 8 Ont. App. [Can.] 440; *Phelps v. Curts*, 80 Ill. 112; *Gardiner Bank v. Wheaton*, 8 Me. 381; *Roberts v. Radcliff*, 35 Kan. 502; *Babcock v. Eckler*, 24 N. Y. 632; *Morrill v. Kilner*, 113 Ill. 318; *Bohannon v. Combs*, 79 Mo. 305; *Reeves v. Sherwood*, 45 Ark. 520; *Bullett v. Worthington*, 3 Md. Ch. 99; *Williams v. Banks*, 11 Md. 198; *Kipp v. Hanna*, 2 Bland Ch. [Md.] 33.

Where a judgment debtor has fraudulently conveyed his property to hinder and delay creditors, the party who first invokes the aid of the court to set aside such conveyance acquires a prior lien for his judgment. (*Pullis v. Robison*, 73 Mo. 202; *George v. Williamson*, 26 Mo. 190; *Bank of U. S. v. Burke*, 4 Blackf. [Ind.] 141; *Hills v. Sherwood*, 48 Cal. 393; *Henriques v. Hone*, 2 Edw. Ch. [N. Y.] 123; *Richardson v. Ralphsnyder*, 20 S. E. Rep. [W. Va.] 854; *Citizens Bank v. Farwell*, 11 C. C. A. [U. S.] 108; *Miner v. Lane*, 87 Wis. 348; *Brown v. Carroll*, 41 S. Car. 50.)

*Connell & Ives,* for Maria Hellman, appellant:

Assuming the evidence of the agreement to convey is inadmissible, the transfer of the home as well as that of the insurance policy, and the payment of the premiums should be sustained as voluntary conveyances on the ground of Mr. Hellman's solvency when they were made. (*Wolf v. McGugin,* 16 S. E. Rep. [W. Va.] 798; *Reade v. Livingston,* 3 Johns. Ch. [N. Y.] 481; *Lockhard v. Beckley,* 10 W. Va. 87; *Atkins v. Atkins,* 18 Neb. 477; *Steele v. Coon,* 27 Neb. 597; *Seward v. Jackson,* 8 Cow. [N. Y.] 406; *Pratt v. Curtis,* 2 Low. [U. S.] 90; *Kent v. Riley,* 14 L. R. Eq. Cas. [Eng.] 190; *Aultman v. Obermeyer,* 6 Neb. 260; *Stevens v. Carson,* 30 Neb. 545; *Johnson v. Johnson,* 36 Neb. 700; *Ware v. Purdy,* 60 N. W. Rep. [Ia.] 526; *Brackett v. Waite,* 4 Vt. 389; *Rose v. Colter,* 76 Ind. 590; *Van Wyck v. Seward,* 6 Paige Ch. [N. Y.] 67; *Updegraff v. Theaker,* 57 Mo. App. 50; *Emerson v. Opp,* 38 N. E. Rep. [Ind.] 330; *Holden v. Burnham,* 63 N. Y. 74; *Salmon v. Bennett,* 1 Conn. 525; *Spence v. Dunlap,* 6 Lea [Tenn.] 457; *Stevens v. Robinson,* 72 Me. 381; *Hinde v. Longworth,* 11 Wheat. [U. S.] 199; *Pike v. Miles,* 23 Wis. 164; *Windhaus v. Bootz,* 25 Pac. Rep. [Cal.] 404; *Morgan v. Hecker,* 16 Pac. Rep. [Cal.] 317; *Herring v. Richards,* 3 Fed. Rep. 443; *Providence Savings Bank v. Huntington,* 10 Fed. Rep. 871; *Bank of U. S. v. Housman,* 6 Paige Ch. [N. Y.] 526; *Jackson v. Post,* 15 Wend. [N. Y.] 588; *Dunlap v. Hawkins,* 59 N. Y. 347; *Carr v. Breese,* 81 N. Y. 584.)

Assuming that the evidence of the agreement is admissible, then Mrs. Hellman is a *bona fide* purchaser for a valuable consideration, and is not estopped to assert her title. (*Haas v. Sternbach,* 41 N. E. Rep. [Ill.] 51; *Singree v. Welch,* 32 O. St. 320; *Weaver v. Gregg,* 6 O. St. 550; *Quarles v. Lacy,* 4 Munf. [Va.] 251; *Buzzard v. Briggs,* 7 Pick. [Mass.] 533; *Nims v. Bigelow,* 45 N. H. 343; *Harvey v. Alexander,* 1 Rand. [Va.] 219; *Taylor v. Moore,* 2 Rand. [Va.] 573; *Garlick v. Strong,* 3 Paige Ch. [N. Y.] 440; *Marston v. Dresen,* 55 N. W. Rep. [Wis.] 896; *Hopkins v. Joyce,* 78 Wis. 443.)

The evidence showing the agreement between Mrs. Hellman and her husband is admissible. (*Wamsley v. Crook*, 3 Neb. 344; *Magemau v. Bell*, 13 Neb. 249; *Mutual Life Ins. Co. v. Armstrong*, 6 Sup. Ct. Rep. 877; *Skinner v. Skinner*, 38 Neb. 760; *McNulty's Appeal*, 19 Atl. Rep. [Pa.] 936; *Hurlburt v. Hurlburt*, 28 N. E. Rep. [N. Y.] 651; *Lynn v. Lyerle*, 113 Ill. 129; *Griffin v. Griffin*, 17 N. E. Rep. [Ill.] 784; *Cady v. Walker*, 28 N. W. Rep. [Mich.] 805; *Livingston v. Wagner*, 42 Pac. Rep. [Nev.] 290; *Wyland v. Griffith*, 64 N. W. Rep. [Ia.] 673; *Colt v. McConnell*, 19 N. E. Rep. [Ind.] 106; *Carey v. Carey*, 12 S. E. Rep. [N. Car.] 1038; *In re Bauer*, 21 Pac. Rep. [Cal.] 759; *Appeal of Goodwin Gas-Stove & Meter Co.*, 12 Atl. Rep. [Pa.] 736.)

Creditors cannot recover premiums paid by an insolvent upon insurance for a reasonable amount where the policies are written payable to the wife. (*Central Nat. Bank v. Hume*, 9 Sup. Ct. Rep. 41.

*Simeon Bloom*, also for appellants.

*Montgomery & Hall*, for David Adler & Sons Clothing Company, appellee:

There is no competent evidence establishing or tending to establish the alleged contract. (*Buckingham v. Roar*, 45 Neb. 248; *Scroggin v. Johnston*, 45 Neb. 722; *Bradford v. Vinton*, 26 N. W. Rep. [Mich.] 407; *Brock v. Brock*, 9 Atl. Rep. [Pa.] 486; *Wamsley v. Crook*, 3 Neb. 351; *Ransom v. Schmela*, 13 Neb. 74; *Housel v. Cremer*, 13 Neb. 298; *Wylie v. Charlton*, 43 Neb. 840; *Grier v. Cagle*, 87 N. Car. 377; *Johnston v. Johnston*, 27 N. E. Rep. [Ill.] 930; *New York Mutual Life Ins. Co. v. Armstrong*, 117 U. S. 597; *Davis v. Davis*, 26 Cal. 23-38; *Martin v. Smith*, 25 W. Va. 587; *Clark v. Clough*, 23 Atl. Rep. [N. H.] 526; *Basye v. State*, 45 Neb. 281; *Nelson v. Becker*, 32 Neb. 99; *Root v. Wright*, 84 N. Y. 72; *Westover v. Ætna Life Ins. Co.*, 99 N. Y. 56; *United States v. Trans-Missouri Freight Ass'n*, 166 U. S. 327; *Lynn v. Lyerle*, 113 Ill. 134.)

The alleged contract of July, 1891, as against plaintiff,

followed by the transfer in March, 1892, considering Mrs. Hellman's false idea of the extent of her interest in the mortgaged real estate, and, having in view the inadequacy of the consideration as now claimed, but neither alleged nor testified to, and all the facts and circumstances, constitutes a transaction fraudulent in fact. (*Kircham v. Kratky*, 51 Neb. 191; *Bartlett v. Cheesbrough*, 23 Neb. 767; *Carson v. Stevens*, 40 Neb. 112; *Brownell v. Stoddard*, 42 Neb. 177; *Trumble v. Trumble*, 37 Neb. 340.)

The alleged contract, if proved, and if otherwise valid, did not justify or make legal the conveyance of the real estate in controversy in March, 1892, to Mrs. Hellman, because, under the circumstances of this case, such contract, as against the plaintiff, is without force. (*Roy v. McPherson*, 11 Neb. 197; *Thompson v. Loenig*, 13 Neb. 386; *Hoagland v. Wilson*, 15 Neb. 320; *Steele v. Coon*, 27 Neb. 586; *Stevens v. Carson*, 30 Neb. 544; *Early v. Wilson*, 31 Neb. 458; *Swartz v. McClelland*, 31 Neb. 646; *Brownell v. Stoddard*, 42 Neb. 177; *Porter v. Goble*, 55 N. W. Rep. [Ia.] 530.)

As against plaintiff, ignoring the alleged contract of July, 1891, the transfer of the real estate in controversy should not be sustained as a voluntary conveyance on the ground of the alleged solvency of Mr. Hellman on March 14, 1892. (*Murray v. Stanton*, 99 Mass. 345; *Meixell v. Kirkpatrick*, 6 Pac. Rep. [Kan.] 241; *Esch v. Chicago, M. & St. P. R. Co.*, 39 N. W. Rep. [Wis.] 129; *Little Rock J. R. Co. v. Woodruff*, 5 S. W. Rep. [Ark.] 792; *Bullett v. Worthington*, 3 Md. Ch. 99; *Kipp v. Hanna*, 2 Bland. Ch. [Md.] 26; *Parish v. Murphree*, 54 U. S. 94; *Williams v. Banks*, 11 Md. 198; *Schaible v. Ardner*, 56 N. W. Rep. [Mich.] 1105; *Potter v. McDowell*, 31 Mo. 62; *Gardiner Bank v. Wheaton*, 8 Me. 381; *Morrill v. Kilner*, 113 Ill. 318; *Bohannon v. Combs*, 79 Mo. 305; *Reeves v. Sherwood*, 45 Ark. 520; *Johnson v. Johnson*, 36 Neb. 700.)

As against the plaintiff, regardless of any technical definition of insolvency, the transfer of March 14, 1892, was invalid, because, under the particular circumstances

of this case, the real estate transferred was equitably charged with the payment of the plaintiff's claim and could not, to the prejudice of the plaintiff, be conveyed by Mr. Hellman to Mrs. Hellman without consideration. (*Smith v. Sands*, 17 Neb. 501; *Thompson v. Loenig*, 13 Neb. 386; *Steele v. Coon*, 27 Neb. 598; *Stevens v. Carson*, 30 Neb. 544; *Carson v. Stevens*, 40 Neb. 115; *Brownell v. Stoddard*, 42 Neb. 184.)

HARRISON, C. J.

It appears herein that during a period of twenty-five or more years prior to 1892 and inclusive of a few of the earlier months of said year Meyer Hellman was engaged in business in the city of Omaha as a dealer in clothing, the greater portion of the time both at wholesale and retail, but during the last five years exclusively the latter. On March 14, 1892, he and his wife, Maria Hellman, executed a deed by which they conveyed to Charles Wise, a relative, a piece of real property, their home in Omaha, worth about $35,000, which was by the grantee and his wife on the same day conveyed to Maria Hellman. On the same date Hellman executed a will in which his wife, Maria Hellman, was designated sole legatee and executrix of his estate. After his death, which occurred March 29, 1892, the will was duly probated and Mrs. Hellman qualified and assumed and performed the duties of executrix. During the month of December, 1891, he had assigned to his wife a policy of insurance on his life in the sum of $5,000. There was of insurance on the life of Meyer Hellman in the aggregate $59,500, in all contracts for the payment of which Mrs. Hellman was designated as beneficiary except one for $5,000, in which the children of the parties were beneficiaries. This action was instituted for David Adler & Sons Clothing Company in the district court of Douglas county to obtain a decree by which the transfer of the real estate to Maria Hellman, to which we have referred, might be adjudged fraudulent and void and canceled, and the real

22

estate subjected to the payment of the claim of the plaintiffs, now appellees, against the estate of Meyer Hellman. During the course of the litigation the First National Bank of Omaha, the Nebraska National Bank of the same city, Lowman's Sons, and Simeon Bloom became of parties to the suit by intervention. Each sought to have the deed of the real estate to Maria Hellman set aside as fraudulent and void as to creditors of Meyer Hellman, and the property made of the assets of his estate; also the assignment of the one policy of life insurance; and further, that all premiums or assessments paid by Meyer Hellman on contracts of life insurance during a period of time it was asserted by the pleading he had been insolvent, should be decreed of the estate and subjected to the payments of the claims against it. At the close of a trial in the district court the interveners were denied any relief and their petitions dismissed and the prayer of the petition of David Adler & Sons Clothing Company was granted. The two banks and Lowman's Sons have appealed from the decree against them, and Maria Hellman has appealed from the decree in favor of David Adler & Sons Clothing Company.

In the bill of exceptions there appears the opinion of the trial court, and therein a clear statement, in substance, of the main facts as shown by the evidence, and since it also shows the impressions and ideas which the court had gathered from the evidence, we deem it proper to here reproduce it, as follows:

"The defendant Maria Hellman is the widow of Meyer Hellman, who departed this life in March, 1892. For twenty-five years or more prior to his death Meyer Hellman had been engaged in the wholesale and retail clothing business in this city, and he acquired a reputation for integrity and fair business methods, which I understand is not questioned by any one interested in this litigation. The amount of capital with which he engaged in business has not been shown, nor does it seem to be material to the issues involved, but at the date of his

death, in March, 1892, he was possessed of property of great value, but which, with the exception of that in controversy in this action and perhaps a few other small pieces, was heavily incumbered. For a few years prior to his death he had engaged to a considerable extent in real estate transactions, and had incurred an indebtedness aggregating over $300,000. While the fact does not clearly appear, it may be fairly assumed that his transactions in real estate had absorbed his ready means to such an extent that he had become a large debtor of the banks, and in the summer of 1891 he had become indebted to the Nebraska National Bank to the amount of about $28,000, and to the First National Bank to the amount of about $80,000. He was also at that time indebted to various wholesale houses on merchandise accounts to quite an amount, and all of these creditors were demanding payment of or security for their debts, and two or three of his mercantile creditors had taken judgments for the amount of their claims. He was married to the defendant in 1871, and while it does not clearly appear, I assume that he was the owner of lots 1 and 2, in Johnson's Addition, at the time of his marriage. These two lots were inclosed together, and shortly after his marriage he erected a three-story brick dwelling-house on lot 1, together with a barn and other improvements, and he occupied the premises with his family from that time up to the date of his death. His widow, the defendant in this action, now occupies it as her home, and she holds the legal title thereto under a deed of conveyance made to her by him shortly prior to his death in March, 1892. Some time in the summer of 1891, and about the time that one or more of his mercantile creditors had put their claims against him into judgment, negotiations were commenced between Hellman and the officers of the two banks looking to the securing of his debts to these two institutions by mortgage on his real estate. Prior to and during these negotiations he had listed his property and placed an estimated value on

each parcel of the same, which list was used during the negotiations. It is conceded that he had planned the making of mortgages upon different parcels of his real estate to his different creditors, apportioning the same among them in a manner which he at the time insisted would afford ample security for all of them. In this plan he had reserved the property in controversy in this suit, which we may call the home property, and had insisted that this property should not be incumbered but should be reserved for his family. During these negotiations Mr. Connell acted with him and as his attorney, and Mr. Congdon was the attorney of the First National Bank, his power, however, extending no further than to pass upon the title of the property offered as security and to advise relative to the legal questions which might arise. After negotiations, which extended over some months, the two banks finally accepted second mortgages upon some portions of the property that had been mortgaged prior to this date to the Northwestern Mutual Life Insurance Company, and first mortgages upon various other tracts, and others of his creditors were secured by taking mortgages upon other and different tracts. In order to make these mortgages a first lien, and in order to pay certain mercantile bills which were then pressing, and interest due the banks, the First National Bank made him at this date a further loan of $9,500, and the Nebraska National Bank a loan of $3,000. By agreement between the parties the money advanced on these new loans was left in the hands of Mr. Kountze of the First National Bank to be by him used for the purposes above indicated, and the money was so used. The mortgages executed at this time aggregated something over $200,-000, and evidence has been introduced which, if competent, shows that when Mrs. Hellman was asked to join in these mortgages she refused to do so except upon the condition that her husband would convey to her the home property. This he agreed to do, and subsequently, and a few days prior to his death, the conveyance was made.

I gather from the evidence that this security taken by the banks was taken as collateral to the amount then due and owing them by Hellman, but with the oral understanding or agreement that if the interest was promptly paid foreclosure proceedings would not be instituted immediately, but Mr. Hellman given ample time in which to discharge these debts. It is shown beyond dispute that at the date of the execution of these mortgages Hellman was unable to pay the interest due and owing upon his loans from the banks, and it is also shown that an execution was issued upon one of the judgments obtained against him prior to the execution of these mortgages and placed in the hands of the sheriff, who went to his store for the purpose of levying the same, but that no levy of the execution was actually made upon any of his stock. We insert here it is of testimony that this levy, or whatever action was taken, was to cause the mortgages to be executed in which there was what was thought to be somewhat of slowness or delay on the part of Hellman.

Subsequently, Mr. Hellman not being able to pay the interest on his indebtedness to the banks, foreclosure proceedings were instituted upon the mortgages, the mortgaged property sold, and in some instances large deficiencies exist. It is not controverted that the estate of Mr. Hellman is entirely insolvent, and the banks and others who intervened in this action are now seeking to reach the home property conveyed to Mrs. Hellman and have it applied to the payment of their claims. During his lifetime Mr. Hellman had taken out life insurance policies, all but one of them being made payable to his wife, and this one was assigned to her in the month of December previous to his death. The interveners also claim the right to have applied to the payment of their claims the premiums paid upon these life insurance policies since 1891, and the full amount of the policy which was assigned to Mrs. Hellman in December, 1891. These are the main features of the case so far as the interveners' rights are concerned.

"The claim of the plaintiff in the action rests upon a somewhat different state of facts. About the first of June, 1891, one Myers, a traveling salesman for the plaintiff David Adler & Sons Clothing Company, took an order from Mr. Hellman for a bill of goods and sent it to his house in Milwaukee. The credit-man, upon investigation, refused to fill the order, and had some correspondence with Mr. Hellman relating thereto. In September of the same year Mr. Myers again visited this city and took another order for substantially the same amount of goods. At this time Mr. Hellman referred Myers to Dun's Mercantile Agency for a statement of his credit, and also showed him a list of his assets which included unincumbered real estate amounting to seventy or eighty thousand dollars. On the 28th of September Myers telegraphed his house that he had arranged with the Dun agency for full particulars about Hellman's affairs and the Omaha agency forwarded to the Milwaukee agency the statement which Hellman had furnished the agency here. This statement was furnished by the Milwaukee agency to the plaintiff, and contained, among other matters, Hellman's statement of his unincumbered real estate, which included the home property which Hellman had agreed in the summer previous to convey to his wife, and which he did convey to her in March, 1892. Mr. Oberndorfer, the credit-man of David Adler & Sons Clothing Company, testified that upon the strength of this statement and certain correspondence had with Mr. Hellman which has been introduced in evidence, he filled the order, amounting to $5,000 or more, and the plaintiff now claims that the home property which was included in the list of Mr. Hellman's assets in the statement which he made to procure credit should be subjected to the payment of its bill.

"No party to this litigation questions the good faith of Mr. Hellman in making the conveyance to his wife. No actual fraud or intent to defraud creditors is charged against him or the defendant; but it is said that Hell-

man at the date of the deed to his wife was insolvent and that the withdrawal of this valuable property from the reach of his creditors was a legal fraud or fraud in law, which voids the conveyance when creditors ask that the property conveyed shall be applied to the payment of their claims. This necessitates an examination of the meaning of insolvency under circumstances such as surround this case. A great volume of testimony has been introduced to show the value of the real estate possessed by Hellman at the date of his death. Without reviewing this evidence I think it fair to all the parties to the litigation to base my findings upon the evidence of Mr. Lewis S. Reed, who all the parties agree is a fair witness, and whose judgment of real estate values is conceded to be equal to that of any one in the city; and while an interested party to the extent of being an officer of the Nebraska National Bank, even the attorneys for the defendant pay him the high compliment of being a man whose testimony would not be varied on that account. Two statements furnished by Mr. Hellman to the banks during the negotiations for the making of these mortgages have been introduced in evidence. These statements contain a list of the property owned by Hellman, and attached to each parcel is an estimate of its value. Mr. Reed states that he thinks the estimated value fixed upon the property by Mr. Hellman was excessive to the extent of from twenty to thirty per cent. A deduction of twenty-five per cent from that value ought to be a fair guide for the court in this investigation. The value attached by Mr. Hellman to his real estate in these statements foots up $660,000. Deducting therefrom twenty-five per cent would leave $495,000. I do not know that I can arrive with absolute certainty at the exact indebtedness with which Hellman should stand charged at the date of his death. Taking the figures of Mr. St. Clair, he states that the claims allowed by the probate court were $204,953, and claims not allowed in that court, being mortgages upon real estate not filed, $159,581, make a

total indebtedness of $364,534. During the argument it was shown and admitted that Mr. St. Clair's statement included the expenses of the last illness and funeral of Mr. Hellman; a claim against Hellman arising from liability as an indorser for Mr. Oberfelder, amounting to $10,250, which the evidence clearly shows has since been discharged as to Hellman; ground rent accrued since the date of his death; a contingent claim allowed to the Cambridge bank; the claim of the Snowden estate; interest on the gross amount of his debts from the date of his death; the mortgage of one Forbes, which is now outlawed, and which it was never sought to enforce; and one-half of what is known as the Proctor mortgage; making a total amount of over $30,000, which were not properly chargeable against him at the date of his death. What is known as the Marblestone mortgage is included in Mr. St. Clair's statement, both under the head of claims allowed and claims not allowed, which would increase his statement $8,500 above what it should be. It will thus be seen, taking the figures of the interveners and deducting therefrom say $35,000, which I am clearly of the opinion are wrongfully included, that Hellman's indebtedness at the date of his death did not exceed $325,000 or $330,000. In addition to the real estate owned by him, and which as we have seen, estimated at the value put upon it by Mr. Lewis S. Reed, amounted to $495,000, the stock of merchandise was appraised at, and I think fairly worth, the sum of $30,000; the store fixtures, $3,000; there was actually collected from accounts, $5,573; and averaging the testimony relative to the value of the flats and houses standing upon leased ground, they were of the value of $12,000; other personal property possessed by him may be placed at $1,000. This would give him total assets to the value of $546,573. Placing his debts at the highest figure, $330,000, he would be possessed of assets in excess of his liabilities to the amount of $216,573. The value of the real estate conveyed to the wife may be put at $35,000 and the question

is whether, supposing the conveyance of that property to her was entirely voluntary, no consideration passing at all, it could be said he did not retain enough under ·ordinary circumstances and conditions to fully meet all obligations against him."

In the decree appeared the following statements:

"The defendant Maria Hellman is the widow of Meyer Hellman, who departed this life in March, 1892, leaving surviving him his widow and six children as the issue of his marriage with said Maria Hellman, as .follows: Blanche, a daughter, aged nineteen years; Mabel, aged seventeen years; Selma, aged fourteen years; Lillian, aged twelve years; Clarence, aged six years; Grace, aged four years.

"The court further finds that for twenty-five years and more prior to his death the said Meyer Hellman had been engaged in business in the city of Omaha in the wholesale and retail clothing business, the last five years or more being in the retail trade exclusively, and acquired a reputation for integrity and fair business methods, and that in all the transactions, representations, and dealings involved in this controversy and in making the deed of conveyance and assigning the policy of insurance to his wife, of which complaint is made, he acted in good faith and without intent to hinder, delay, or defraud his creditors, and that the said defendant Maria Hellman, in receiving said conveyance and assignment, also acted in good faith and without intention to hinder, delay, or defraud creditors.

"The court further finds that by the strict rule applied to merchants and traders, Hellman was insolvent in March, 1892, but for the purposes of this case, in determining whether the conveyance to his wife was fraudulent in law, he was perfectly solvent, having assets in excess of his liabilities at the time of the value of more than $200,000, estimated at their fair market value; that he was the owner of and possessed of property to the value as follows, to-wit:

Real estate of the value of....................$495,000
Stock of merchandise of the value of.......... 30,000
Store fixtures of the value of................. 3,000
Accounts and bills payable of the value of...... 5,573
Flats and buildings on leased ground of the
    value of...................................... 12,000
Other personal property of the value of........ 1,000

                                                     $546,573

"The court further finds that during the year 1891 and down to the time of the death of said Meyer Hellman, in March, 1892, his entire indebtedness did not exceed $325,-000 or $330,000, and that placing his said indebtedness at the highest figure, $330,000, he was possessed of assets in excess of his liabilities to the amount of $216,573.

"The court further finds that the real property involved herein, and hereinafter more particularly described, was improved by said Meyer Hellman about 1881, by the construction of a brick dwelling-house, barn, and other improvements, and that he occupied the premises so improved as a home with his family from that time up to the date of his death in March, 1892, and that since said last mentioned date his widow, the said Maria Hellman, has occupied said house as her home, and holds the legal title thereto under a deed of conveyance made to her shortly prior to said date.

"The court further finds the value of said home property in the month of March, 1892 to have been $35,000, and that the same was conveyed to said defendant by said Meyer Hellman in good faith and without intent to hinder, delay, or defraud his creditors, and was so received by said defendant, at a time when the said Meyer Hellman was solvent, for the purposes of such conveyance, being possessed of a surplus of property amounting to $216,000 in excess of his entire indebtedness, which at that date amounted to about $30,000.

"The court further finds that the said deed conveying to the defendant Maria Hellman the said home property

was for a valuable and sufficient consideration, and was made pursuant to an agreement between the said Meyer Hellman and Maria Hellman in July, 1891, by reason whereof the said Maria Hellman was induced to relinquish her dower interest in a large amount of real estate; that mortgage liens thereon, free from such incumbrance, might be made, as was thereafter made, to creditors of the said Meyer Hellman, including the interveners, the First National Bank of Omaha and the Nebraska National Bank of Omaha, and Simeon Bloom, which each had the benefit of said home property so conveyed to said defendant by receiving in consideration thereof the relinquishment of her dower interest in the real estate mortgaged to said banks and said Bloom, and which said banks and said Bloom, respectively, took as security for the indebtedness of said Meyer Hellman to them.

"And the court further finds that nearly all of the said Hellman's real estate had been mortgaged to secure his creditors at the time of his deed to his wife; and that at the time of his death he owed the First National Bank about $80,000 and the Nebraska National Bank about $28,000, and that in February, 1892, the said Hellman was sued for $80,000 or more, the suit being to foreclose the debt to the First National Bank, the Nebraska National being made a party, and on June 18, 1892, filed its cross-bill for $7,000 and interest, and the Northwestern Insurance Company being a defendant, and on March 26, 1892, the cross-petition was filed to foreclose mortgages to the Northwestern Mutual Life Insurance Company aggregating $60,000.

"And the court further finds that the deed of Hellman and wife to Wise and Wise's deed to Mrs. Hellman and Hellman's will, leaving all his property to his wife, were executed at the same time, and about two weeks prior to his death, but were not recorded until after his death.

"And the court further finds that the statements of his property furnished by Hellman, and used in negotiations with the banks, contained this item: '280x240,

24' and St. Mary's, which item included the property in controversy, the latter being a piece of ground 143x159 feet; and that the $495,000 of real estate owned by Hellman in 1892 as above found included the homestead.

"And the court further finds that no contract, express or implied, was made between the banks and Hellman that the home property should be left free for Hellman's family, but Hellman at all times refused absolutely to include in the mortgages the property afterwards conveyed to his wife, refused to pledge it for debts at the bank, and insisted on keeping it free from any liens whatever; that Mr. Connell acted as attorney for Hellman in the negotiations relating to the mortgages executed to the banks, and Mr. Congdon as attorney for the banks, but Mr. Congdon was empowered only to pass upon the title of the property and to advise as to the legal questions which might arise; that Mr. Congdon fully understood Hellman's intention to retain the home property for himself and family free from any liens.

"The court further finds that just prior to July, 1891, two judgments were obtained against Hellman, and an execution on one of them was in the hands of the sheriff, and he was in the store for the purpose of levying the execution about the time when the interveners, the banks, advanced to him $12,500 on August 6 or 7, 1891, and that such advancements were made to discharge those judgments and make their mortgages taken at that time a first lien, and for the purpose of paying delinquent interest and merchandise accounts then due, and that this advancement of $12,500 was a part and parcel of the same transaction in which the mortgages to the banks were given.

"And the court further finds that at the time of the conveyances to Mrs. Hellman there were outstanding mortgages amounting to over $260,000; that the intervening banks took their mortgages in the summer of 1891 as collateral securities to the notes of Hellman, which matured in the fall and summer previous, and which

Hellman was then unable to pay; and that the Hellman estate is now insolvent; and there remain unpaid claims against the estate, including interest, of more than $100,-000.

"And the court further finds that the following items were not properly chargeable against him at the date of his death, namely: The expenses of the last illness and funeral; the note of Oberfelder, amounting to $10,250; the amount of ground rent accrued since the date of Hellman's death; the claim of the Cambridge City Bank; the claim of the Snowden estate; the interest on the amount of Hellman's debts accruing since the date of his death; the Forbes mortgage, which is outlawed; one-half of what is known as the Proctor mortgage; and the Marblestone mortgage; making a total of over $30,000, which was excluded in fixing the amount of Hellman's indebtedness, in the foregoing finding, at $330,000.

"And especially with reference to the plaintiffs' claim herein the court further finds that in June, 1891, the plaintiffs received through their traveling salesman an order from Hellman for goods, which order they did not fill for want of a satisfactory statement of his financial condition, respecting which correspondence was had until late in September of the same year, when the same salesman came to Omaha and took from Hellman another order for substantially the same amount of goods, being those upon which the action in controversy is based. At that time Hellman referred the salesman to Dun's Mercantile Agency for a statement of his credit and also showed him a list of assets, which included unincumbered real estate amounting to about $70,000. The statement which had been furnished the Dun agency was forwarded by the latter to the plaintiff; said statement, and also the one shown to the salesman, included the home property, and was used as a basis for obtaining credit, the plaintiff selling Hellman the goods upon the faith of it, in connection with the correspondence in evidence.

"And the court further finds that Mrs. Hellman took

no steps to enforce her claim to the property, or to give notice to the world of her claims of ownership or of the contract, under which it was subsequently conveyed to her; and that the defendant Maria Hellman is estopped from setting up her claim to the property as against the equities of the plaintiff."

The first question which is presented is the right of the creditors to institute and prosecute this action. As the transfers which it was sought to avoid as fraudulent were to the executrix and so shown by the pleadings, causes were asserted for which relief might be afforded in an action. The jurisdiction of the county court in the settlement of estates of decedents does not afford ample remedy. (*Becker v. Anderson*, 6 Neb. 499; *Harvey v. McDonnell*, 21 N. E. Rep. [N. Y.] 695.)

It was of the contention for Maria Hellman in the trial court and of the issues that at the time her husband was about to execute mortgages on various real properties in favor of creditors inclusive of the banks, appellants herein (this was when the banks as a part of the transactions loaned to Meyer Hellman $12,500), she refused to sign the mortgages unless her husband would agree to convey to her the home property, to which he finally acceded, and pursuant to such agreement she signed the mortgages, thus rendering her dower right in the properties subject to the liens of the mortgages and liable to be sold for their satisfaction and so extinguished. The testimony adduced to show the agreement in which this claim had its origin was of Mrs. Hellman and Mr. Connell of her counsel. It was objected at the time of its introduction and is now urged that all the testimony relative to this agreement was and is incompetent; hence the agreement was not shown and should not have been by the trial court and cannot by this be considered. The objection was based, as is the argument, on the restrictions and limitations of our Code in regard to evidence. (See Code of Civil Procedure, secs. 329, 332, 333.) The trial court decided that the testimony

of Maria Hellman was incompetent, and in this we think it was right. By section 211 of chapter 23, Compiled Statutes, it is made the duty of an executor or administrator, when there is a deficiency of assets of the estate of a decedent and the deceased during life shall have conveyed any property with intent to defraud his creditors, to institute and prosecute an action for the avoidance of the transfer and the recovery of the property to be of the estate and for the benefit of the creditors thereof. In the matter at bar the executrix was also the alleged fraudulent grantee of property alleged to have been conveyed in fraud of creditors by the deceased during his lifetime, and she could not or would not commence and maintain the necessary action and the creditors must and could do so, and in the action by them they occupied the position relative to the estate and its interests which would have been occupied by the executrix had she been without adverse interest, and had been, as contemplated by statute, plaintiff in the suit. The testimony of the alleged fraudulent grantee of the transaction or agreement, out of which came the conveyance attacked, would have been as to her incompetent and not receivable under the provisions of section 329 of the Code of Civil Procedure, and was as much so as against the creditors who instituted and were urging the suit. (*Grier v. Cagle,* 87 N. Car. 377.) From which it follows that the testimony of Mrs. Hellman was incompetent for the purpose offered in this action.

The testimony of Mr. Connell, it is insisted, was and is open to the objection that it was a privileged communication to him in his professional capacity and could not be disclosed. Our Code contains a provision which debars an attorney from detailing in testimony privileged communications (see Code of Civil Procedure, sec. 333), and if the matters which the witness herein stated were within the meaning of the words "confidential communications" and made for the purposes contemplated by the section of the statute, they were incompetent. At the

time the statements were made which constituted the asserted agreement, Mrs. Hellman, immediately after the noon lunch, had gone to the office of Mr. Connell to consult him in regard to her rights in the real estate owned by her husband, and also in what manner and to what extent her rights, if any, would be affected by her signing the mortgages which she had been asked to execute. The firm of which Mr. Connell was a member was then, and had been for some considerable time prior thereto, acting for Meyer Hellman in many matters in which the services and advice of an attorney were desired or necessary. At that time there was in the statutes an enactment of the legislature by which, probably, subject to the payment of debts, the wife on the death of her husband became entitled of right absolute to a designated portion or share of the real estate of which he died seized. It has since been adjudged unconstitutional. (See *Trumble v. Trumble*, 37 Neb. 340.) Mr. Connell's advice to Mrs. Hellman seems to have been given with the idea in mind that the statutory provision to which we have just referred was valid and in force. However this may have been, it is true that when she signed the mortgages she placed her dower right in the real estate in jeopardy.

Mr. Hellman came to the office during the interview between her and Mr. Connell and asked to know why she was down town at that hour, and was informed of her business there, and the conversation then ensued in which, it is asserted, the agreement was made to convey to her the home property, and by virtue of which it was afterwards so conveyed. In none of the interviews or conversations which were then and there had was there anything which was confided by Mr. Hellman to Mr. Connell in his professional capacity; the parties to the purported agreement were both there, and what was said was open and without reserve, and it was competent for Connell to give it in evidence. (19 Am. & Eng. Ency. Law 139; *Lynn v. Lyerle*, 113 Ill. 129; *Griffin v. Griffin*, 17 N. E. Rep. [Ill.] 784; *Cady v. Walker*, 28 N. W. Rep.

[Mich.] 805; *Hurlburt v. Hurlburt*, 28 N. E. Rep. [N. Y.] 651; *Carcy v. Carcy*, 12 S. E. Rep. 1038, 108 N. Car. 267; *Deuser v. Walkup*, 43 Mo. App. 625; *Livingston v. Wagner*, 42 Pac. Rep. [Nev.] 290; *Wyland v. Griffith*, 64 N. W. Rep. [Ia.] 673.)

It is further argued in this connection that if it be conceded that the contract was made between the husband and wife it was of none effect, since the wife was—in fact both were—possessed of a false idea at the time, which constituted a basis or consideration for the compact on the part of the husband; *i. e.*, that, as they had been informed, the wife, by signatures attached to the mortgages, would relinquish an absolute right to one-third of the real estate of the husband. This was true to a certain degree, but it was also true—it was thoroughly understood by both parties—that the wife, if she executed the projected mortgages, would render liable to the operation of their conditions all the rights she had, either present or prospective, in the real estate described in the instruments. Of what the rights consisted they probably did not at the time have an exact or definite realization, but there was not such an inexactness or confusion as to make ineffective or nugatory their contract.

It is also urged in this same line of argument that the dower right of the wife in the real property included in the several mortgages, considered as a whole, did not furnish any adequate consideration in its worth or value for the conveyance of her home property. There was evidence introduced of a manner of computation of the value of a dower right of a wife in her husband's property. Of the accuracy, worth, or conclusiveness of the computation by the prescribed method it is not within our province at the present time to inquire. It probably furnished as nearly a correct abstract valuation of a dower right, somewhat intangible as the latter may be said to be, as can or could be essayed. It has been stated by this court in its opinion, wherein was determined the strength or nature of a wife's right of dower in real estate

owned by the husband, that the inchoate right of dower, when it once attaches, remains and continues an incumbrance or charge upon the real estate unless or until released by the voluntary act of the wife or extinguished by the operation of law. While not an estate in possession, it is a present right or interest of a legal character. (Compiled Statutes, ch. 23, sec. 1; *Butler v. Fitzgerald*, 43 Neb. 192; *Wylie v. Charlton*, 43 Neb. 840.) If it is such an interest and may be the subject of a release or relinquishment by her, she may make the release, or that she subject it to the lien of a mortgage by her signature, the consideration for substantive matters of conveyance to her. (*Singree v. Welch*, 32 O. St. 320; 2 Scribner, Dower 7.)

In this case the testimony of this agreement was competent and material on the question of the intent with which the home property was conveyed to the wife, whether fraudulent or not, if for no other purpose, and if not sufficient to establish an ample consideration for such transfer to stamp it as a conveyance for value and not of the character of a gift. It may be added here, as urged by counsel for Maria Hellman, that the appellants herein, from the portion of the decree in her favor and against them, desired that the mortgages be executed, that thereby directly and indirectly the payment of the indebtedness of Meyer Hellman to them respectively might be secured, or some further and better assurance of it afforded, and by reason of this, their purpose being given full scope and effect by the signature of the wife to the mortgages, they derived the benefits of such acts on her part. It may be truthfully said that they had no knowledge, at the time, of the contract between the husband and wife or of the promise or concession necessary to be made to her before they could realize their business wishes or plans in regard to the husband's property, but they became nevertheless the recipients of the effects of her acts pursuant to the terms of the agreement. The transaction relative to the dower right of the wife was sufficient alone to sustain the conveyance of the

home to her as to all creditors who attacked it, except the plaintiff, at least to the extent of the full value of such interest.

We will now turn our attention to another point or element of the main question herein involved—the financial condition of Meyer Hellman at the times particularly drawn into view in this litigation. We may as well here say that in the consideration of all the matters herein it must be borne in mind that in this state, by statutory law, the question of fraudulent intent in a conveyance attacked as is the one in question herein shall be deemed a question of fact and not of law (Compiled Statutes, ch. 32, sec. 20); to which must be added, in an attack on a conveyance between relatives or husband and wife the burden of proof is on the grantee to establish the *bona fides* of the transfer. (*Carson v. Stevens*, 40 Neb. 112.)

To go back now to the matter of the financial circumstances of Meyer Hellman at the times of the occurrences from which this litigation originated, and whether he was, in the light of the evidence herein introduced, solvent or insolvent, it may be said that in the examination and decision of similar controversies many courts have stated, generally, that insolvency means that the party whose business affairs are in question is unable to pay his debts as they become due in the ordinary course of his daily transactions (*Buchanan v. Smith*, 16 Wall. [U. S.] 308); also, "Insolvency is the inadequacy of a man's funds to the payment of his debts." (*Herrick v. Borst,* 4 Hill [N. Y.] 652.) Within a strict or literal application of the first rule, Hellman might have been, as a merchant, adjudged insolvent at the time the banks received the mortgages on his real estate, and made him loans in the aggregate the sum of $12,500, but subsequent to this, and up to the time of his decease, it was of the testimony that he had paid his mercantile accounts as they became due, although he did not promptly pay taxes or the interest on some of his loan indebtedness. In cases like this, in which the main, if not sole, factor

on which the creditors rely to establish the fraudulent character of a transfer is the insolvency of the grantor, —for herein it cannot be asserted with any degree of success that there was other evidence of such intent on the part of either the grantor or grantee,—many courts, inclusive of this, have announced a different and more liberal doctrine relative to what is or shows insolvency. In the opinion in the case of *Johnson v. Johnson*, 36 Neb. 700, in which case the litigation was instituted to subject some real estate to the claim of the plaintiff on the ground that the debtor had put his money in the property, which, nominally at least, belonged to his mother, and such action had caused his insolvency, it was stated: "The proof fails to show that Chris Johnson was insolvent when he made the improvements in question for his mother, or that he made the improvements in contemplation of insolvency. A person who is apparently able to pay his debts and believes himself to be so, and has no design to defraud his creditors, may make a valid gift to a relative. The gift, however, must not be disproportionate to his means, nor such as will produce insolvency. The proof fails to show that this gift, if such it was, produced the insolvency of Chris Johnson." (See also *Emerson v. Opp*, 38 N. E. Rep. [Ind.] 330; *Ware v. Purdy*, 60 N. W. Rep. [Ia.] 526; *Windhaus v. Bootz*, 25 Pac. Rep. [Cal.] 404.) Some courts hold that the valuation of the property retained is to be of the time of the transfer which is the subject of attack. Within this doctrine there was ample evidence herein to sustain the finding of the trial court that Meyer Hellman had, at the time he transferred the home property to his wife, also when he assigned to her the one policy of life insurance, sufficient property to satisfy his indebtedness, and the judgment as to these matters as between appellants and Maria Hellman was right. We will add here that there was not such proof that the appellants were so influenced in the allowance of credit to Meyer Hellman by any ownership thereof as to raise an estoppel in their

favor against the claim of title thereto by Mrs. Hellman. (*Goldsmith v. Fuller*, 30 Neb. 563.)

In relation to the premiums and assessments which had been paid for the life insurance during the stated term we are cited by counsel for Maria Hellman to a decision of the supreme court of the United States. (See *Central Nat. Bank v. Hume*, 9 Sup. Ct. Rep. 41, wherein creditors were denied the right to recover life insurance premiums under facts very similar to the circumstances developed on the same subject-matter herein.) On the other hand, for the appellants, our attention is directed to a strong opinion of the court of New Jersey. (See *Merchants & Miners Transportation Co. v. Borland*, 31 Atl. Rep. [N. J.] 272, wherein a contrary doctrine is advanced; also to an able article in the 25 Am. Law Review, page 185, by Mr. Williston, in which the opinion in *Central Nat. Bank v. Hume* is criticised.) After an examination and consideration of the arguments and reasons of the opinions and the article to which we have referred, and the subject in general, we are satisfied with the opinion of Chief Justice Fuller and will follow it. As therein stated, cases may arise in which there may be disclosed payments of large premiums, out of all reasonable proportion to the financial condition of the party, and under circumstances which stamp them as fraudulent as to creditors or justify the inference of fraud on creditors in the withdrawal of such sums from the resources of the debtor, and call for the court, in the exercise of its power, to cause them to be repaid from the amount realized from the policies of the premiums of which they were payments; but no such state of facts was shown in this action, and we must approve the judgment of the district court on this branch of the case.

We have now reached that portion of the judgment of which Maria Hellman, as appellant, complains, by which the David Adler & Sons Clothing Company was given a lien for the amount of its claim on the home property which was conveyed to her by her husband, on the ground

that the facts in regard to the indebtedness embodied in such claim showed that the credit was given to Meyer Hellman under and by virtue of such representations relative to his property and that which at the time was of record in his name inclusive of the home property, afterward conveyed to the wife, as estopped her from the assertion of her claim of title as against the rights of the clothing company. There was sufficient proof to sustain the findings of the trial court that the clothing company relied on Meyer Hellman's asserted ownership of this particular piece of property and was by this be-lief quite largely influenced in the extension of the credit out of which arose the claim in suit. This being true, the trial court was right in the judgment. (*Roy v. Mc-Pherson*, 11 Neb. 197; *McGovern v. Knox*, 21 O. St. 547; *Early v. Wilson*, 31 Neb. 458.)

It follows from the conclusions reached that the judgment will be

AFFIRMED.